IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | |
|---|---|
| PERATON GOVERNMENT COMMUNICATIONS, INC., | Civ. No. 20-00287 JMS-WRP |
| Petitioner, | ORDER (1) GRANTING PETITIONER'S MOTION TO CONFIRM, ECF NO. 1; AND (2) DENYING RESPONDENT'S MOTION TO VACATE, ECF NO. 29, ARBITRATION AWARD |
| vs. | |
| HAWAII PACIFIC TELEPORT L.P., | |
| Respondent. | |

## ORDER (1) GRANTING PETITIONER'S MOTION TO CONFIRM, ECF NO. 1; AND (2) DENYING RESPONDENT'S MOTION TO VACATE, ECF NO. 29, ARBITRATION AWARD

## I.  INTRODUCTION

Petitioner Peraton Government Communications, Inc. ("Peraton" or "Petitioner") moves under § 9 of the Federal Arbitration Act ("FAA"), 9 U.S.C. § 9, to confirm a June 22, 2020 arbitration award issued by the International Chamber of Commerce ("ICC") International Court of Arbitration (the "arbitration award").  ECF No. 1.  The arbitrator decided in favor of Peraton and against Respondent Hawaii Pacific Teleport L.P. ("HPT" or "Respondent") by not only denying and dismissing HPT's arbitration claim of over $8 million, but also by awarding Peraton over $1.5 million in attorneys' fees and costs as a prevailing party.  ECF No. 19-2 at PageID ## 161, 185.  HPT responds by filing a Motion to

Vacate Arbitration Award under 9 U.S.C. § 10. ECF No. 29. Based on the following, the court GRANTS Petitioner's Motion and DENIES Respondent's Motion. The arbitration award is CONFIRMED.[1]

## II. **BACKGROUND**

The court has reviewed the extensive record, of which the parties are intimately familiar. The court's decision, however, need not reiterate all the details of the underlying dispute and the business relationship between the parties. Rather—given the "extremely limited review," *Kyocera Corp. v. Prudential-Bache Trade Servs., Inc.*, 341 F.3d 987, 998 (9th Cir. 2003), that federal courts undertake of arbitration awards under the FAA—the court sets forth only the basic background necessary to put this decision in context, focusing on the two main contractual provisions at issue.

HPT operates a teleport in Kapolei, Hawaii, "and is an international provider of satellite and fiber-based communications, providing connectivity between the Americas and Asia Pacific regions." ECF No. 19-2 at PageID # 158.

---

[1] On February 17, 2021, Peraton wrote a letter to this court purportedly notifying the court of certain (disputed) transactions that Peraton had learned about during settlement conferences. ECF No. 61. Peraton asked this court to "take these issues into consideration in determining when to issue its order on Peraton's motion to confirm arbitral award." *Id.* at PageID # 1867. The subject of the letter is disputed, ECF No. 62, and refers to matters that are not part of the record. It would be completely improper to take Peraton's letter into account in the making of this court's decision. The court DENIES Peraton's request to take its letter into consideration, and, to be clear, the court did not take it into account at all.

HPT's facility has "multiple satellite antennas designed to communicate with satellite spacecraft by transmitting and receiving radio waves in various bands." *Id.* at PageID # 163.  It provides uplink and downlink services from satellites stationed over the Pacific Ocean, with customers that service the United States government, airlines, shipping companies, cruise lines, and satellite operators.  *Id.* at PageID # 158.

In 2017, Peraton was serving as a U.S. Government contractor supplying satellite communications support to the "U.S. Army Network Enterprise Technology Command" and "ultimately, the U.S. Indo-Pacific Command."  *Id.* at PageID # 164.  For such purposes, in a March 1, 2018 Service Order related to a Carrier Services Agreement ("CSA") between Peraton and HPT, Peraton purchased bandwidth on a communications satellite owned and operated by Eutelsat America Corporation ("Eutelsat").  *Id.* at PageID # 158.  HPT had "position[ed] itself as a reseller of bandwidth on Eutelsat's E174A satellite."  *Id.* at PageID # 164.  Peraton contracted for bandwidth for the period from June 2018 to June 2019, agreeing to pay HPT $361,300 per month for a certain frequency from June 2018 to May 2019, and $578,080 per month for an additional frequency from July 2018 to June 2019.  *Id.* at PageID # 158.  HPT billed Peraton for June 2018 through January 2019, but Peraton only paid for June to September 2018 and for a

portion of October 2018.  *Id.*  On December 20, 2018, Peraton purported to retroactively terminate the Service Order or CSA as of October 2018.  HPT then billed Peraton for an early termination fee.  *Id.*

After Peraton refused to pay the balances owed for the unpaid monthly invoices and the early termination fee, HPT initiated the underlying arbitration proceedings before the ICC International Court of Arbitration, seeking "$8,768,216.08, plus additional late fees" from Peraton.  *Id.* at PageID # 161. Peraton asserted a counterclaim of over $3 million that was contingent on certain rulings in favor of HPT.  *Id.* at PageID # 162.

As its primary defense, Peraton relied on § 14.3 of the CSA, a limitation of liability clause providing in all uppercase print:

> In no event shall either party or any of their respective affiliates be liable to the other party or any of their respective affiliates or employees or to any third party for: (a) any loss of profit or revenue, or for any indirect, consequential, incidental, punitive or similar or additional damages, whether incurred or suffered as a result of unavailability of facilities, performance, non-performance, termination, breach, or other action or inaction under this agreement, or for any other reason, even if such party advises the other party of the possibility of such loss or damage; or (b) for any outage or incorrect or defective transmissions, or any direct or indirect consequences thereof, except as is specifically provided in section 8.3 of this agreement and section 5 of the service exhibit regarding outage credits.

4

ECF No. 29-4 at PageID # 443 (uppercase emphasis omitted).

The arbitrator agreed with Peraton that the limitation of liability clause barred HPT's claims for nonpayment and for the early termination fee.  He reasoned that, under the plain and unambiguous terms of § 14.3, neither Peraton nor HPT may be held liable for "any loss" of "profit or revenue" or "any indirect, consequential, incidental, punitive or similar or additional damages," as a result of "non-performance, termination, breach, or other action or inaction."  ECF No. 19-2 at PageID # 172.  HPT was seeking lost "revenue" (or lost anticipated profits) for Peraton's "termination" or "breach" of the CSA.  *Id.*  The arbitrator found the clause fully enforceable under New York law (which governs the CSA, *see* ECF No. 29-4 at PageID # 447), reasoning that both parties are sophisticated corporate entities with equal bargaining power, and that the clause (part of a "standard form contract" proposed by HPT) was mutual—it applied equally to both sides.  ECF No. 19-2 at PageID ## 172-73.

In so ruling, the arbitrator rejected HPT's arguments that the clause was meant to bar "consequential damages" (not general damages) and that Peraton's commercially-unreasonable reading would essentially render the contract illusory as it allowed Peraton to breach the CSA without consequence and for no reason.  *Id.* at PageID ## 173-74.  But HPT's reading, the arbitrator reasoned, was

inconsistent with the unambiguous language of the clause, especially when considering its punctuation—with a comma after "revenue" in the clause "any loss of profit or revenue, or for any indirect, consequential, incidental, punitive or similar or additional damages"—indicating "three separate categories of lost [profits], lost revenues, or consequential damages." *Id.* at PageID # 174.

The arbitrator also looked to expert opinion in determining that such a construction was commercially reasonable. He relied on Peraton's expert witness, Stephen Smith, who testified orally and through a written report, that such broad limitation of liability clauses "are a common tool among government contractors and subcontractors as well as commercial contractors in the space industry to limit the immense damages that may flow from contracts involving satellites," *id.* at PageID # 175, "particularly where government contracts are anticipated at some stage in the chain of contracts." *Id.* Smith further testified that "[t]ypically . . . parties are unwilling to accept the possibility of potentially massive known and unknown loss contingencies that flow from such contracts and, as a result, construct liability provisions that broadly and aggressively limit the shifting of liability except in very specific, enumerated circumstances." *Id.* In this instance, for example (in a simplified description), apparently Peraton stopped paying HPT because the U.S. Government terminated an agreement with Peraton, but HPT

remained liable to pay Eutelsat for bandwidth.  ECF No. 37-19 at PageID ## 1237-

43; ECF No 19-2 at PageID # 168.  Specifically, the arbitrator found:

> Based on the factual record presented in this case,
> including Mr. Smith's testimony, I find that the
> interpretation of §14.3(a), and of the CSA as a whole,
> adopted above in this Final Award is commercially
> reasonable, and that, at the time of contracting, §14.3(a)
> reasonably could have been viewed by both contracting
> parties as a desirable limitation of liability provision,
> potentially of benefit to both contracting parties, of the
> sort frequently agreed upon by contracting parties in the
> satellite industry.  HPT's present difficulties have arisen
> not because it agreed to the limitation of liability
> provision set forth in §14.3 of the CSA when it made the
> decision to act as a reseller rather than as a broker in
> its transaction with Peraton, but because it did not
> include mirror limitation of liability provisions in its
> upstream contract—the Eutelsat [Master Service
> Agreement]—with Eutelsat, the satellite owner, when it
> chose to assume the risks of a reseller.

ECF No. 19-2 at PageID # 176.

After rejecting HPT's arguments and ruling in favor of Peraton on

HPT's claim, the arbitrator found Peraton to be the prevailing party and awarded it

over $1.4 million in fees and expenses (where fees had been sought by both parties

as part of their claim or counterclaim, should they prevail) under § 16.3 of the

CSA, which provides:

> The Parties hereto agree that a prevailing Party shall be
> entitled to recover all reasonable costs and expenses
> (including all reasonable attorney's fees and

> disbursements) of such arbitration proceeding, as well as
> all cost for said proceeding.  This Section 16.3 shall be
> severable from the other provisions of this Agreement
> and shall survive and shall be merged into any such
> judgment.

ECF No. 29-4 at PageID # 444.  Specifically, the arbitrator awarded Peraton

$1,275,971.14 in attorneys' fees, $196,559.47 in expenses, and $95,000 as

reimbursement from HPT for costs of the arbitration.  ECF No. 19-2 at PageID

# 185.

Peraton filed this action on June 25, 2020, seeking to confirm the

arbitration award under the FAA.  ECF No. 1.  On September 14, 2020, HPT filed

its Opposition, ECF No. 24, and on September 21, 2020, it filed a separate Motion

to Vacate the award, ECF No. 29.  On November 16, 2020, Peraton filed its

Opposition to the Motion to Vacate.  ECF No. 37.  And on November 23, 2020,

HPT filed its Reply.  ECF No. 43.  After a December 7, 2020 hearing, the parties

filed supplemental memoranda regarding subject-matter jurisdiction on December

11 and December 18, 2020.  ECF Nos. 51, 53.  Thereafter, the parties held

settlement discussions, ECF Nos. 52, 58-59, which were unsuccessful.  The

motions are now ripe for decision.

///

///

### III. **DISCUSSION**

**A.     The Court Has Subject-Matter Jurisdiction**

Initially, HPT contends that the court lacks subject-matter jurisdiction to confirm the arbitration award, arguing that the amount in controversy does not exceed "the sum or value of $75,000, exclusive of interest and costs," as required under 28 U.S.C. § 1332(a).  *See* ECF No. 51 at PageID # 1840.[2]  HPT relies on a rule reiterated in several district court decisions that "[g]enerally, when a petitioner seeks confirmation of an arbitration award without seeking remand for further arbitration proceedings, the amount in controversy is the value of the award itself." *Sgromo v. Scott*, 2020 WL 6136092, at *4 (N.D. Cal. Oct. 19, 2020) (citations omitted); *see also, e.g.*, *LG Elecs. MobileComm U.S.A., Inc. v. Reliance Commc'ns., LLC*, 2018 WL 2059559, at *4 (S.D. Cal. May 3, 2018).  On the other hand, according to this line of cases, "when a party seeks to re-open arbitration proceedings, the amount in controversy for purposes of diversity jurisdiction . . . is

---

[2] Although the FAA provides the basis to confirm or vacate an arbitration award, it does not confer federal subject-matter jurisdiction.  *See, e.g.*, *United States v. Park Place Assocs., Ltd.*, 563 F.3d 907, 918 (9th Cir. 2009).  Rather, "[t]here must be diversity of citizenship or some other independent basis for federal jurisdiction." *Id.* at 918-19 (quoting *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 25 n.32 (1983)).  The parties agree that complete diversity of citizenship exists.  *See* ECF Nos. 47, 48.  The question is how to measure the amount in controversy.

the amount at stake in the underlying [arbitration]." *LG Elecs.*, 2018 WL 2059559, at *4 n.1.

Peraton's petition seeks to confirm an arbitration decision that awarded no damages, rejecting HPT's claim entirely (where HPT sought over $8 million from Peraton in the arbitration), but also awarded Peraton—as the prevailing party under the § 16.3 of the CSA—over $1.5 million in attorneys' fees and costs ($1,472,530 in fees and expenses, as well as $95,000 for the cost of arbitration). *See* ECF No. 19-2 at PageID # 185. HPT argues that the $1.5 million awarded to Peraton must be excluded from the amount in controversy under § 1332(a) because it constitutes "costs" within the meaning of the CSA and New York law. ECF No. 51 at PageID # 1844; *see* 28 U.S.C. § 1332(a) (requiring that "the matter in controversy exceed[] the sum or value of $75,000, *exclusive of* interest and costs") (emphasis added). That is, according to HPT, under the *Sgromo/LG Elecs.* line of cases (because the parties do not specifically seek to remand or to "reopen" arbitration proceedings) the amount in controversy for jurisdictional purposes is zero, the "value of the award itself to the petitioner." *LG Elecs.*, 2018 WL 2059559, at *4.

HPT's argument fails, however, because the "costs" referred to in § 1332(a) refer to *prospective* costs incurred during the federal litigation, not

"costs" awarded in an underlying litigation (in this instance, the arbitrator's $1.5 million award the parties seek to confirm or vacate).[3]  *See Farmers Ins. Co. v. McClain*, 603 F.2d 821, 823 (10th Cir. 1979) ("The phrase 'exclusive of interest or costs' in section 1332 obviously refers to interests or costs which might be awarded in connection with the federal diversity, proceedings."); *Perez v. Foremost Ins. Co.*, 2018 WL 2473573, at *2 (W.D.N.Y. June 4, 2018) ("[Section 1332(a)] excludes interest and costs that may be anticipated in the federal action.") (quoting *McClain,* 603 F.2d at 823); 14AA Charles A. Wright et al., *Federal Practice and Procedure* § 3712 (2011) ("Of course, when the subject matter of the controversy happens to be or include the costs awarded in an earlier lawsuit, they may be considered in computing the jurisdictional amount.") (noting cases).

Accordingly, over $1.5 million—at minimum—is in controversy.[4] Peraton seeks to confirm, and reduce to judgment, that award in its favor (even

---

[3] This assumes, without deciding, that the $1.47 million in attorneys' fees and expenses awarded by the arbitrator would constitute "costs" under § 16.3 of the CSA.  HPT's argument might also fail because, even if the actual award was zero, the "value" of the award to Peraton was actually much higher as Peraton had successfully defended against a multi-million dollar claim.

[4] The true amount in controversy may actually be the "$8,768,216.08, plus additional late fees" that HPT originally sought from Peraton in the arbitration.  ECF No. 19-2 at PageID # 161. The parties have applied case law (the *Sgromo*/*LG Elecs.* line of cases) as stated by various district courts.  Circuit court opinions, however, when deciding "whether the amount in controversy for establishing diversity jurisdiction over a petition to confirm an arbitration award is the amount awarded by the arbitration panel or the amount previously sought in the arbitration

(continued . . .)

assuming it represents "costs" awarded in the arbitration).  And HPT seeks to vacate that award.  In short, the $75,000 threshold is easily met, and the court has jurisdiction.

## B.     The Court Confirms the Arbitration Award

### 1.     *Applicable Standards Under the FAA*

Under the FAA, "if a party seeks a judicial order confirming an arbitration award, 'the court must grant such an order unless the award is vacated, modified, or corrected as prescribed in section 10 and 11 of this title.'"  *Kyocera Corp.*, 341 F.3d at 997 (quoting 9 U.S.C. § 9) (emphasis omitted).  "'[C]onfirmation is required even in the face of erroneous findings of fact or

---

(. . . continued)
proceeding . . . generally follow one of two approaches—the award approach or the demand approach."  *Pershing, LLC v. Kiebach*, 819 F.3d 179, 182 (5th Cir. 2016) (citation omitted). "Under the award approach, the amount in controversy is determined by the amount of the underlying arbitration award regardless of the amount sought.  In contrast, under the demand approach, the amount in controversy is the amount sought in the underlying arbitration rather than the amount awarded."  *Id.* (citations and editorial marks omitted).  Under a "demand approach," the amount in controversy here would be the over $8 million sought by HPT in the arbitration.

Although somewhat unclear, the Ninth Circuit appears to follow a "demand approach." *See Am. Guar. Co. v. Caldwell*, 72 F.2d 209, 211 (9th Cir. 1934) ("It is the amount in controversy which determines jurisdiction, not the amount of the award."); *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Moore*, 171 F. App'x 545, 546 (9th Cir. 2006) ("The amount at stake in the underlying litigation, not the amount of the arbitration award, is the amount in controversy for purposes of diversity jurisdiction.") (unpublished) (quoting *Theis Research, Inc. v. Brown & Bain*, 400 F.3d 659, 662 (9th Cir. 2005)).  In turn, however, *Theis Research* appears under its particular facts to consider as a factor whether the FAA action sought to "reopen" the arbitration proceedings.  *See* 400 F.3d at 665.  But because the amount in controversy here is otherwise easily met, the court need not decide the scope of the rule in the Ninth Circuit if the arbitration award were truly zero.

misinterpretations of law.'" *Id.* (quoting *French v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 784 F.2d 902, 906 (9th Cir. 1986)).

> Rather, § 10 [of the FAA] permits vacatur only:
>
> (1) where the award was procured by corruption, fraud, or undue means;
>
> (2) where there was evident partiality or corruption in the arbitrators, or either of them;
>
> (3) where the arbitrators were guilty of misconduct in refusing to postpone the hearing, upon sufficient cause shown, or in refusing to hear evidence pertinent and material to the controversy; or of any other misbehavior by which the rights of any party have been prejudiced; or
>
> (4) where the arbitrators exceeded their powers**,** or so imperfectly executed them that a mutual, final, and definite award upon the subject matter submitted was not made.

*Id.* (quoting 9 U.S.C. § 10(a)) (emphasis omitted).  "[A]rbitrators 'exceed their powers' in this regard not when they merely interpret or apply the governing law incorrectly, but when the award is 'completely irrational,' or exhibits a 'manifest disregard of law.'" *Id.* (citations omitted).

The Ninth Circuit has repeatedly said that "manifest disregard of law" "means something more than just an error in the law or a failure of the arbitrator[] to understand or apply the law." *Collins v. D.R. Horton, Inc.*, 505 F.3d 874, 879 (9th Cir. 2007) (citation omitted).  "It must be clear from the record that the

arbitrator[] recognized the applicable law and then ignored it." *Id.*  The court "[does] not decide the rightness or wrongness of the [arbitrator's] contract interpretation, only whether the [arbitrator's] decision 'draws its essence' from the contract." *Bosack v. Soward*, 586 F.3d 1096, 1106 (9th Cir. 2009) (citation and quotation marks omitted).  "An award draws its essence from the agreement if the award is derived from the agreement, viewed in light of the agreement's language and context, as well as other indications of the parties' intentions." *Id.* (citations and quotation marks omitted).  "[A]s long as the arbitrator is even arguably construing or applying the contract and acting within the scope of his authority, that a court is convinced he committed serious error does not suffice to overturn his decision." *United Paperworkers Int'l Union, AFL-CIO v. Misco, Inc.*, 484 U.S. 29, 38 (1987).

### 2.    *The Arbitration Award Satisfies the FAA's Standards*

#### a.    *Irrationality or manifest disregard of law*

Upon careful review of the record and the arbitration award, the court cannot say that the arbitration award was *completely* irrational or in *manifest* disregard of the law.  The arbitrator applied what he perceived to be the plain and unambiguous language of § 14.3—and the clause's words indeed provide that "*in no event* shall either party . . . be liable . . . for . . . *any* loss of . . . revenue . . .

incurred . . . as a result of . . . non-performance, termination, [or] breach[.]"  ECF

No. 29-4 at PageID # 443 (emphases added).  The arbitrator explained that the

clause was not the product of unequal bargaining power, as both parties are

unquestionably sophisticated corporate entities.  He explained that similarly-

worded clauses have been upheld under New York law, and accepted an expert's

view that such clauses are not commercially unreasonable in certain contexts.  *See*

ECF No. 19-2 at PageID ## 172-176.  And he described why he found such a

reading to be consistent with other clauses of the CSA regarding performance.  *Id.*

at PageID # 176.

HPT's argument that the arbitrator's conclusion is unreasonable ("No

vendor would ever intend or agree to provide goods or services if there was no

obligation for the purchaser to pay for them," ECF No. 29-1 at PageID # 375) has

much force.  *See Elorac, Inc. v. Sanofi-Aventis Can., Inc.*, 343 F. Supp. 3d 789,

804 (N.D. Ill. 2018) ("There would have been no point entering into such a

detailed agreement if non-performance could carry no possibility of sanction.")

(citation and internal quotation marks omitted) (applying New York law).  But the

arbitrator based his decision on the language of the CSA and an explanation that

such clauses are common in the industry, where cancellation of government

contracts are often anticipated.  Even if this court might have concluded differently

(when construing the limitation clause in light of the CSA as a whole) if it were deciding the matter in the first instance, the court cannot conclude that the arbitrator "recognized the applicable law and ignored it." *Collins*, 505 F.3d at 879 (citation omitted). The standard under the FAA is not whether this court agrees with the arbitrator, or whether the award was right or wrong—it is whether the award "draws its essence" from the CSA. *See Bosack*, 586 F.3d at 1106. And here, the arbitration award satisfies that standard.

> b.   *Expert testimony*

Next, HPT argues that the arbitrator erred in relying on expert testimony to determine the subjective intent of the parties where he (inconsistently) found § 14.3 to be unambiguous and where the CSA contains a broad integration clause. *See* ECF No. 19-2 at PageID # 170. But it is far from clear that the arbitrator used Smith's expertise as a basis to infer the parties' intent. The arbitrator first found the language of § 14.3 to be unambiguous, and only then did he turn to the expert's opinion to conclude that his interpretation was commercially reasonable—and did so in response to HPT's argument that it was not. *See* ECF No. 19-2 at PageID # 175 ("The argument [that contractual rules of construction are violated if they result in a commercially unreasonable construction of the CSA] *also* fails . . . because its premise is faulty.") (emphasis added).

HPT admits that "there may be circumstances in which expert testimony is not extrinsic evidence, such as providing meaning to a technical term," ECF No. 43 at PageID # 1119, which is similar to what was done here.  In essence, the expert report does not appear to have been used to infer the parties' intent; it was used to explain why the unambiguous language (as he saw it) was consistent with industry practice.  *Cf. Law Debenture Tr. Co. of N.Y. v. Maverick Tube Corp.*, 595 F.3d 458, 466 (2d Cir. 2010) ("Evidence as to such custom and usage is to be considered by the court where necessary to understand the context in which the parties have used terms that are specialized.") (applying New York law).  "In such circumstances, the court must be informed of the meaning of the language as generally understood in that business, in light of the customs and practices of the business."  *Id.* (quotation marks and citation omitted); *see also General Refractories Co. v. First State Ins. Co.*, 855 F.3d 152, 160 (3d Cir. 2017) ("[O]ur inquiry does not immediately end when the plain meaning of the [contractual] provision is unambiguous.  Evidence of industry custom or trade usage 'is always relevant and admissible in construing commercial contracts,' and does not depend on the existence of ambiguity in contractual language.") (quoting *Sunbeam Corp. v. Liberty Mut. Ins. Co.*, 781 A.2d 1189, 1193 (Pa. 2001)).  "Where it can be shown that words have a special meaning or usage in a particular industry, 'members of

that industry are presumed to use the words in that special way, whatever the words mean in common usage and regardless of whether there appears to be any ambiguity in the words.'"  *Id.* (quoting *Sunbeam Corp.*, 781 A.2d at 1193).

In any event, again, this court does not decide whether the arbitrator applied the law incorrectly, but whether his decision was completely irrational or in manifest disregard of the law.  Even if the arbitrator erred in relying too much on the expert's opinions regarding industry practices, this court cannot conclude that his decision did not draw its essence from the CSA.  Here, he was clearly interpreting and applying the CSA's language in light of the industry practice.  That is enough.

      c.    *Discovery*

HPT also argues that the award should be vacated under 9 U.S.C. § 10(a)(3) ("refusing to hear evidence pertinent and material to the controversy; or of any other misbehavior by which the rights of any party have been prejudiced") because the arbitrator refused to allow certain discovery relevant to the parties' intent for various provisions of the CSA, especially § 14.3.  "The phrase 'refusing to hear evidence pertinent and material to the controversy' necessarily implies prejudice to the rights of a party without regard to the final catch-all phrase."  *U.S. Life Ins. Co. v. Superior Nat'l Ins. Co.*, 591 F.3d 1167, 1174 (9th Cir. 2010).

"Arbitrators enjoy wide discretion to require the exchange of evidence, and to admit or exclude evidence, how and when they see fit." *Id.* at 1175 (quotation marks and citation omitted). The question under § 10(a)(3) is whether the arbitrator's "misconduct," if any, was prejudicial. *Id.*

Here, HPT sought certain documents from Peraton's board of directors, as well as authorization to take two depositions. ECF No. 29-1 at PageID # 383. The arbitrator authorized extensive discovery, issuing several procedural orders regarding the scope of discovery and exchanges of information. *See* ECF Nos. 37-10 to 37-12. The arbitrator's procedural orders, however, determined that depositions were "inappropriate in terms of time and expense" (given that the ICC's arbitration rules do not customarily allow for oral depositions)—although he nevertheless allowed parties to request to take "one or more such depositions for good cause shown." ECF No. 37-10 at PageID # 792. After considering letter briefs on HPT's request for depositions, the arbitrator denied the request because HPT did not demonstrate "good cause." ECF No. 37-16 at PageID # 827. He also considered Peraton's objections to HPT's requests for documents from Peraton's board of directors, and sustained that objection. *Id.* at PageID # 828.

19

Given these circumstances, HPT's due process rights were sufficiently protected. *See U.S. Life Ins. Co.*, 591 F.3d at 1173 ("[W]hen interpreting and applying the FAA, we are mindful not to impose the federal courts' procedural and evidentiary requirements on the arbitration proceeding; rather our responsibility is to ensure that the FAA's due process protections were afforded."); *id.* ("Section 10(a)'s limited grounds are 'designed to preserve due process but not to permit unnecessary public intrusion into private arbitration procedures.'" (quoting *Kyocera Corp.*, 341 F.3d at 998). That is, there was no "affirmative misconduct" in the arbitrator's refusal to allow certain evidence. *Misco*, 484 U.S. at 40 (reasoning that arbitrator's assumed error in refusing to consider evidence under § 10(a)(3) did not require vacatur where "error was not in bad faith or so gross to amount to affirmative misconduct"). This is especially so here, where HPT has not demonstrated that any error was prejudicial—the arbitrator's core decision was that the language of § 14.3 was unambiguous and thus further extrinsic evidence regarding intent would not have been relevant. *See, e.g., Bank of N.Y Mellon Tr. Co. v. Solstice ABS CBO II, Ltd.*, 910 F. Supp. 2d 629, 641-42 (S.D.N.Y. 2012).[5]

---

[5] HPT's argument that it was prejudiced by the ruling given the timing of Peraton's withdrawal of a settlement inquiry (after the arbitrator disallowed the discovery), *see* ECF No. 43 at PageID # 1126, is pure speculation.

d.   *Evident Partiality*

HPT also argues that the arbitration award must be vacated under 9 U.S.C. § 10(a)(2) ("evident partiality or corruption in the arbitrators").  It bases its argument on the fact that the arbitrator, Thomas Brewer, and Peraton's expert, Stephen Smith, are both members of the American Arbitration Association's International Centre for Dispute Resolution, Aerospace, Aviation, and National Security Panel ("the panel"), *see* ECF Nos. 24-5, 24-7, and that this "relationship" had not been previously disclosed by Mr. Brewer.

After the arbitration award was issued (and after retaining new co-counsel), HPT wrote to Mr. Brewer on August 26, 2020 and questioned whether he should have made (or should make) further disclosures regarding his membership on the panel.  *See* ECF No. 24-6 ("It has now come to our attention that during the pendency of the arbitration, you and one of Peraton's experts in the arbitration, Stephen Smith are on the same [AAA-ICDR Panel]. . . . As our understanding is that your connection to Mr. Smith existed during the arbitration, we request that you address any past or present relationship, direct or indirect, between you [and] Mr. Smith.").

Mr. Brewer wrote back on September 3, 2020, explaining that his membership on the panel had, in fact, been disclosed by its listing on his website

and on his curriculum vitae ("CV").  ECF No. 24-7 at PageID # 328.  He also

pointed out that Mr. Smith's membership was also listed on his CV attached to his

report.  *Id.*  Just as important, Mr. Brewer declared that he did not know Mr. Smith,

had never served as an arbitrator with Mr. Smith, had no contact with him before

or after the Peraton arbitration, and was not previously aware that Mr. Smith was

also a member of the panel.  *Id.*  He explained that the panel "is not a club or a

membership organization," but is "a proprietary list, vetted and maintained by [the

American Arbitration Association], of arbitrators . . . [deemed] qualified to serve

as neutral arbitrators in cases . . . involving aviation, space or national security-

related disputes."  *Id.*  He further explained that he did not know the other

arbitrators on the panel and that the panel "had no involvement concerning the

HPT/Peraton arbitration, which was administered by the ICC and conducted

pursuant to ICC Rules."  *Id.*  Finally, he stated that "[his] neutrality in the case was

entirely unaffected by learning that Mr. Smith was listed on the . . . panel," and that

it "is not a reasonable basis for questioning any arbitrator's impartiality, and

certainly did not affect [his] in this particular case."  *Id.* at PageID # 329.

Initially, the court has confirmed that the co-membership on the panel

was listed on both Mr. Brewer's CV (*see* ECF No. 29-5 at PageID # 471), and on

Mr. Smith's CV as part of his expert report (*see* ECF No. 37-19 at PageID # 1224),

in the course of the arbitration.  That is, the parties had at least constructive notice that both the arbitrator and the expert were members of the panel during the arbitration.  HPT has therefore waived the "evident partiality" claim.  *See Fidelity Fed. Bank v. Durga Ma Corp.*, 386 F.3d 1306, 1313 (9th Cir. 2004) (holding that "a party with constructive knowledge of potential partiality of an arbitrator waives its right to challenge an arbitration award based on evident partiality if it fails to object to the arbitrator's appointment or his failure to make disclosures until after an award is issued").

And, in any event, HPT has failed to meet the standard necessary to vacate the award for evident partiality.  "Under the FAA, vacatur of an arbitration award is not required simply because an arbitrator failed to disclose a matter of some interest to a party."  *Lagstein v. Certain Underwriters at Lloyd's, London*, 607 F.3d 634, 646 (9th Cir. 2010).  Rather—at least for purposes of § 10(a)(2)— the arbitrator "was required to disclose only facts indicating that he 'might reasonably be thought biased *against one litigant and favorable to another.*'"  *Id.* (quoting *Commonwealth Coatings Corp. v. Cont'l Cas. Co.*, 393 U.S. 145, 150 (1968)).[6]  Given Brewer's explanation in his September 3, 2020 letter (and with no

---

[6] It makes no difference for present purposes that the ICC arbitration rules might require an arbitrator to disclose "any facts and circumstances which might be of such a nature as to call into question the arbitrator's independence *in the eyes of the parties*, as well as any

(continued . . .)

indication that it was incorrect), there is no reasonable basis to conclude that Brewer was biased.

       e.    *Public policy*

Next, HPT challenges the $1.47 million award of attorneys' fees to Peraton as a violation of public policy.  ECF No. 29-1 at PageID ## 384-85; *see, e.g.*, *Stead Motors of Walnut Creek v. Auto. Mach. Lodge No. 1173*, 886 F.2d 1200, 1209 (9th Cir. 1989) ("One of the exceptions to the requirement that courts defer to awards of arbitrators is the now-settled rule that a court need not, in fact cannot, enforce an award which violates public policy.").  "To vacate an arbitration award on public policy grounds, [courts] must '(1) find that an explicit, well defined and dominant public policy exists . . . and (2) that the policy is one that specifically militates against the relief ordered by the arbitrator.'"  *Matthews v. Nat'l Football League Mgmt. Council*, 688 F.3d 1107, 1111 (9th Cir. 2012) (quoting *United Food & Com. Workers Int'l Union, Local 588 v. Foster Poultry Farms*, 74 F.3d 169, 173 (9th Cir. 1995)).

---

(. . . continued)
circumstances that could give rise to reasonable doubts as to the arbitrator's impartiality."  ECF No. 29-1 at PageID # 381 (quoting an ICC rule).  The applicable standard is whether to vacate the award under § 10(a)(2), not whether HPT might have subjectively questioned Brewer's independence—prior to knowing his award—under the ICC rule (something the court doubts, given Brewer's explanation in his September 3, 2020 letter).

HPT argues that Peraton's *pro hac vice* counsel should not have been awarded attorneys' fees because, in the arbitration (which occurred in Hawaii), they were committing the offense of unauthorized practice of law in violation of Hawaii Revised Statutes ("HRS") § 605-14 and Rule 1.9A(f) of the Rules of the Supreme Court of the State of Hawaii ("RSCH").  ECF No. 19-1 at PageID # 385-87.  This violation, HPT argues, constitutes a violation of public policy that justifies vacatur of the fee award.

The arbitrator granted unopposed petitions (filed "in an abundance of caution," ECF No. 37-29 at PageID # 1011) by Peraton to admit to the arbitration proceedings five mainland-based attorneys from the Venable LLP firm on a *pro hac vice* basis (with local counsel from the Cades Schutte firm).  *See* ECF No. 24-10; *see also* ECF No. 37-30 at PageID ## 1056-83.  This was done as set forth in RSCH 1.9A(a), which provides:

> An attorney not licensed in Hawaiʻi, but who is admitted to practice and in good standing with the highest court of a state or territory of the United States or the District of Columbia, may associate with a licensed Hawaiʻi attorney (Hawaiʻi attorney) to represent parties in the course of or in connection with an arbitration proceeding in Hawaiʻi that concerns a legal dispute over a Hawaiʻi-related matter, provided that the petition to appear, accompanied by the materials set forth in subsection (b) of this Rule, is approved in writing by the arbitrator or, if there are multiple arbitrators, a majority of the arbitrators.

Upon approval, the Hawaii Supreme Court Rules require "[t]he out of state attorney admitted *pro hac vice* in an arbitration [to] pay to the Hawaii State Bar Association the annual Disciplinary Board fee and the annual Lawyers' Fund for Client Protection fee authorized by the Supreme Court of the State of Hawaii[.]"  RSCH 1.9A(d).  "Failure to pay the annual fees within 10 days after entry of the order approving the petition . . . renders the order approving the petition no longer valid.[.]"  *Id.*  And Rule 1.9A(f) provides that "[a]n attorney not licensed in Hawaii who fails to obtain approval to represent a party in an arbitration as required by this Rule, and who proceeds to represent a party in an arbitration proceeding, is subject to referral to the appropriate authorities for potential violation of [HRS] § 605-14 (Unauthorized practice of law prohibited) and other applicable laws."  RSCH 1.9A(f).

HPT argues that, because it is apparently undisputed that Peraton did not pay the Hawaii bar dues after being admitted *pro hac vice*, Peraton violated HRS § 605-14.  *See* ECF No. 43 at PageID ## 1129-30.  The arbitrator's fee award, so the argument goes, should be vacated for this public policy violation. The court rejects HPT's argument for several reasons.

First, even assuming the subject arbitration was a "Hawaii-related matter" under Rule 1.9A(a), it is far from clear that the rules of the Hawaii

26

Supreme Court even apply to an arbitration conducted under the Rules of the ICC International Court of Arbitration and subject to confirmation in a federal court. *See* RSCH 1.9A(h) ("This Rule does not apply to proceedings before state or federal administrative boards or agencies that are authorized to establish their own rules governing the practice of out-of-state attorneys before those bodies.").

Second, HPT was aware—at least constructively—in July 2019 (after the arbitrator granted the petitions to permit counsel to appear *pro hac vice*) that Peraton's counsel could have been in violation of Rule 1.9A, but did not make this argument to the arbitrator.  It is too late to make the argument now.  *See Wellman v. Writers Guild of Am., West, Inc.*, 146 F.3d 666, 673 (9th Cir. 1998) ("'[I]t is well settled that a party may not sit idle through an arbitration procedure and then collaterally attack that procedure on grounds not raised before the arbitrators when the result turns out to be adverse.'") (quoting *Marino v. Writers Guild of Am., East, Inc.*, 992 F.2d 1480, 1484 (9th Cir. 1993)).

Third, it is unclear whether—even assuming Rule 1.9A applies, and that the issue was not waived—Peraton's failure to pay HSBA dues for this arbitration violates "an explicit, well defined and dominant public policy . . . that specifically militates against the relief ordered by the arbitrator." *Matthews*, 688 F.3d at 1111.  In order for the court to vacate the award on this basis, it would have

27

to adjudicate (perhaps with additional fact-finding and an evidentiary hearing)

whether Peraton's counsel in fact violated HRS § 605-14.  But this is not an action

to make that adjudication; indeed, under HRS § 605-15.1, only the Hawaii

Attorney General or the Hawaii State Bar Association has standing to bring an

action for violation of § 605-14.  *See Cunha v. Ward Foods, Inc.*, 501 F. Supp.

830, 834 (D. Haw. 1980) (citing *Reliable Collection Agency v. Dole*, 59 Haw. 503,

509-10, 584 P.2d 107, 111 (1978)).

In short, the public policy argument fails as a basis to vacate the

arbitrator's award.

### f.    An inconsistent award of attorneys' fees

Finally, HPT argues that the arbitrator's award of attorneys' fees is

irrational because it is inconsistent with his reading of the limitation of liability

clause in § 14.3 (barring any claim for "revenue" or "damages" for any "breach or

nonperformance").  HPT asserts that if § 14.3 bars any damages for a breach or

nonperformance, then it should also bar an award of fees.  The court also rejects

this argument.

Section 16.3 of the CSA clearly provides that, in a "dispute relative to

. . . satellite transmission services" under § 16.1, "a prevailing Party shall be

entitled to recover all reasonable costs and expenses (including all reasonable

attorney's fees and disbursements) of such arbitration proceeding, as well as the costs for said proceeding." ECF No. 24-3 at PageID # 289. It continues: "This Section 16.3 shall be severable from the other provisions of this Agreement and shall survive and shall be merged into any such judgment." *Id.* The "reasonable costs and expenses (including all reasonable attorney's fees and disbursements)" in § 16.3 are not "revenue" or "damages" that would be barred under § 14.3. They are not the result of nonperformance or a breach. They are, instead, an award for prevailing at the arbitration. The arbitrator's award was not necessarily inconsistent, and was not completely irrational or manifestly erroneous.

Moreover (putting aside that HPT also sought fees under § 16.3), the clause itself is "severable from the other provisions" of the CSA. And, as with HPT's public policy argument, HPT did not raise it before the arbitrator, meaning it is waived here. *See Wellman*, 146 F.3d at 673.

## C.   Peraton is not Entitled to Fees in this FAA Action

Having now prevailed in this FAA action, Peraton asks this court to award it attorneys fees and expenses under § 16.3 for its success at this level. This argument lacks merit. Section 16.3, by its plain and unambiguous terms, applies only to costs and expenses "of such arbitration proceeding"—not of any court action seeking to confirm (or vacate) an arbitration award. The section is

insufficient to overcome the normal rule that "[a]ttorneys' fees are not available when a party seeks confirmation of an arbitration award in the federal courts pursuant to the [FAA]." *YF Franchise LLC v. Jun Kil An*, 2015 WL 877723, at *4 (D. Haw. Feb. 27, 2015) (citing *Menke v. Monchecourt*, 17 F.3d 1007, 1009 (7th Cir. 1994) ("[T]here is nothing in the [FAA] which provides attorneys' fees to a party who is successful in seeking confirmation of an arbitration award in the federal courts.")).

## IV.  **CONCLUSION**

For the foregoing reasons, the court (1) GRANTS Peraton Government Communications Inc.'s Petition to Confirm and (2) DENIES Hawaii Pacific Teleport L.P.'s corresponding Motion to Vacate Arbitration Award.  The June 22, 2020 arbitration award is CONFIRMED.  The Clerk of Court shall close the case file.

IT IS SO ORDERED.

DATED:  Honolulu, Hawaii, February 26, 2021.



/s/ J. Michael Seabright
J. Michael Seabright
Chief United States District Judge

*Peraton Gov't Commc'ns, Inc. v. Hawaii Pacific Teleport L.P.*, Civ. No. 20-00287 JMS-WRP, Order (1) Granting Petitioner's Motion to Confirm, ECF No. 1; and (2) Denying Respondent's Motion to Vacate, ECF No. 29, Arbitration Award